IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLEN S. FISHER, individually and as a trustee of the MERRILL FISHER TRUST, and LOIS M. FISHER, as a trustee of the MERRILL FISHER FAMILY TRUST | :<br>:<br>: Case No. 4:12-cv-0484<br>:<br>:<br>: (Judge Brann) |
| Plaintiffs, | : |
| v. | : |
| DOMINION TRANSMISSION, INC. | : |
| Defendant. | : |

**MEMORANDUM**
April 1, 2015

On February 10, 2012, Plaintiff Allen S. Fisher commenced this diversity action against Defendant Dominion Transmission, Inc. in the Court of Common Pleas of Centre County. On March 16, 2012, Defendant removed the action to the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1332. Presently before this Court are three motions *in limine* seeking to exclude the expert opinions and testimony of three of Plaintiffs' witnesses. Briefing has concluded and these motions are now ripe for disposition.[1] For the following reasons, Defendant's motions *in limine* as to Dr. Richard R. Parizek and William J. Rogers will be

---

[1] Though Defendant was tardy in filing its Reply Brief, this Court has nevertheless considered the arguments therein in deciding upon the instant motions.

1

denied without prejudice with leave to renew some of its objections at trial in accordance with this memorandum opinion. Defendant's motion *in limine* as to Plaintiff Allen S. Fisher will be denied without prejudice as to the two statements regarding the properties of bentonite mud but with prejudice as to the remaining specific and discrete statements objected to therein.

**I. BACKGROUND**

The Court assumes the parties' familiarity with the factual background and procedural history of this case but will provide a brief review. Plaintiffs are the owners of a dairy farm property in Centre County, Pennsylvania. The farm produces crops which feed the milk-producing livestock. The manure from the livestock is applied to the fields in order to provide for continued crop yields.

Between 2005 and 2006, Plaintiff's parents, Merrill and Lois Fisher, entered into an agreement which granted Defendant an easement to allow Defendant to construct a pipeline on Plaintiff's property for the transportation of natural gas. Defendant commenced pipeline construction on the Fisher farm in 2007 through a process known as horizontal directional drilling (hereinafter "HDD"). This involved drilling underground using a pilot hole and then pushing the pipeline through the pilot hole. Defendant's representatives used bentonite mud, which is a clayish, non-porous material, to lubricate the pipeline as it pushed through the pilot hole.

Following the installation of the pipeline, Plaintiff began to notice and complain of various problems including severe drainage issues which have created large amounts of standing water in his fields and have affected his ability to plant crops and operate equipment on his land. The parties primarily dispute the causation of these issues. Plaintiffs claim that the problems they are experiencing developed as a result of a series of "frack-outs" on the part of Defendant's representatives in which the bentonite mud did not return to the surface as it ordinarily should but rather remained underground. They assert further that the mud dried underground and formed a non-porous barrier underneath the Fisher farm. Defendant avers, on the other hand, that its drilling activities did not create these complained-of problems on the Fisher farm, but that the property has always been poorly drained and therefore prone to the problems Plaintiffs are now experiencing. Rather, it argues, the issues suffered by Plaintiffs, to the extent they even exist, are a result of natural forces.

## II. LEGAL STANDARD

A motion *in limine* is filed prior to trial and requests that the judge rule that certain inadmissible evidence be excluded from introduction or reference at trial. *See Leonard v. Stemtech Health Sciences, Inc.*, 981 F.Supp.2d 273, 276 (D.Del. 2013) (citing *Laufen Int'l, Inc. v. Larry J. Lint Floor & Wall Covering, Co.*, No. 2:10-cv-199, 2012 WL 1458209, at * 1 (W.D.Pa. Apr. 27, 2012) (explaining that a

motion *in limine* requests that the court "prohibit opposing counsel from referring to or offering evidence on matters prejudicial to the moving party.")); *see also Bradley v. Pgh Bd. Of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990) (holding that the purpose of a motion *in limine* is to "narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions."). Evidence should only be excluded on a motion *in limine* if it is clearly inadmissible on all potential grounds. *See id.*; *see also Law v. Stevens Transport*, No. 2:12-cv-544, 2013 WL 4858653, at * 1 (S.D. Ohio Sept. 11, 2013). It is the movant who bears the burden of demonstrating that the evidence is inadmissible on all potential grounds. *See id.* (citing *Berry v. Mission Grp. Kan., Inc.*, No. 08-2439-JPO, 2010 WL 2160897, at *1 (D.Kan. May 28, 2010)).

### III. DISCUSSION

In this case, Defendant is seeking to preclude at trial the expert testimony and opinions of three of Plaintiff's witnesses. The admissibility of expert evidence is governed by Federal Rule of Evidence 702, which allows a witness who is qualified as an expert to give testimony that would otherwise be inadmissible. Fed. R. Evid. 702; *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to

determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Following the United States Supreme Court decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the United States Court of Appeals for the Third Circuit has held that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualifications, reliability and fit." *Schneider*, 320 F.3d at 404. In so holding, it empowered the district court to act as gatekeeper, preventing opinion testimony that does not meet the aforementioned requirements. *See Daubert*, 509 U.S. at 592 ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."). Nevertheless, Rule 702 is not meant to be an exclusionary rule; rather, it is "meant to instruct the district courts in the sound exercise of their discretion in making admissibility determinations." *Holbrok v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996).

Qualification requires that a witness proffered to testify as an expert have specialized knowledge, skills, or training. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741 (3d Cir. 1994); *see also Schneider*, 320 F.3d at 404 (demonstrating that these requirements continue to exist following the 2000

amendments to Rule 702). The Third Circuit has interpreted this requirement liberally, allowing expert testimony of witnesses who have specialized knowledge or training even in the absence of formal qualifications. *See id.* ("Rule 702's liberal policy of admissibility extends to the substantive as well as the formal qualification of experts. We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications. . . . [H]owever, the level of expertise may affect the reliability of the expert's opinion.").

Reliability means that the testimony "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." *Id.* at 742 (quoting *Daubert*, 509 U.S. at 590). In making a determination of reliability, *Daubert* instructs on several nonexclusive factors that may be taken into account: (1) the testability of the expert's hypothesis; (2) whether the methodology has been subjected to peer review and publication; (3) the frequency by which the methodology leads to erroneous results; and (4) the existence and maintenance of standards controlling the technique's operation, and whether the methodology has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94. The Third Circuit has also elaborated on what factors the court should consider,

including: (1) the degree to which the expert testifying is qualified; (2) the relationship of a technique to more established modes of scientific analysis; and (3) the non-judicial uses to which the scientific technique has been put. *See U.S. v. Downing,* 753 F.2d 1224, 1238-39 (3d Cir. 1985); *see also Paoli*, 35 F.3d at 742 ("We now make clear that a district court should take into account all of the factors listed by either *Daubert* or *Downing* as well as any others that are relevant.").

Importantly, this rule does not require that "plaintiffs have to prove their case twice – they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable." *Paoli*, 35 F.3d at 744 ("A judge will often think that an expert has good grounds to hold the opinion that he or she does even though the judge thinks that the opinion is incorrect."); *see also Bourjaily v. United States*, 483 U.S. 171, 175 (1987) ("The inquiry made by a court . . . is not whether the proponent of the evidence wins or loses his case on the merits, but whether the evidentiary Rules have been satisfied.").

Finally, the third prong of the inquiry, fit, necessitates that the expert testimony assist the trier of fact, meaning that there must be a "proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Downing*, 753 F.2d at 1237.

Moreover, while the "primary locus" of a court's gatekeeping role is Federal Rule of Evidence 702, it must also look to other rules, including Federal Rule of Evidence 703. *Daubert*, 509 U.S. at 590. This rule provides, in pertinent part, "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of fact or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703.

**A. Report of Richard R. Parizek**

In its first motion Defendant argues that portions of Dr. Richard R. Parizek's expert opinion should be excluded because they are not based on sufficient facts or data and are not the product of reliable principles and methods as required by Rule 702. In doing so, it hones in on two references made by Dr. Parizek on page 22 of his report.[2] The first is Dr. Parizek's reference to the "extensive" loss of bentonite drilling mud during pipeline construction, because nowhere in his report "does Dr. Parizek quantify or calculate it or even explain why it was extensive." Defendant's

---

[2] Specifically, the objectionable paragraphs are as stated:

> 4. Extensive loss of drilling mud during construction of the angle hole placed below North Eagle Creek flood plain sealed many shallow water bearing openings in the immediate vicinity of the Dominion pipeline. A rise in shallow groundwater levels upstream of the gas line is a plausible outcome within this hydrogeologic setting.

> 5. Shallow groundwater added to and contained in residual soils and shallow bedrock aquifers along North Bald Eagle Valley up stream of Dominion's line would be free to migrate downstream, beyond the pipeline in these same deposits and strata had they not been sealed by drilling mud. It is reasonable to expect more serious drainage problems to occur upstream of the Dominion transmission line.

Expert Report of Dr. Richard Parizek at 22, ECF No. 58-2 (hereinafter "Dr. Parizek Report").

Brief in Supp. at 9, Feb. 23, 2015, ECF No. 50.  Moreover, Defendant argues, Dr. Parizek "completely fails to refer to or cite to any objective evidence that support his claim that any alleged loss of drilling mud during the HDD could be characterized as 'extensive,'" and that he "presents no investigation or testing results that would support such a claim." *Id.* at 9-10.  The second objection Defendant makes to Dr. Parizek's report is his allegation that the mud lost during the HDD "sealed many shallow water bearing openings." *Id.* at 10-11.  It argues again that there is no objective evidence that any mud remains underground which could have "sealed" subsurface openings and that therefore the contention that the mud "sealed" these openings is nothing more than a guess.  Finally, Defendant sets forth a generalized argument that Dr. Parizek focuses almost exclusively on explaining the geological and hydrogeological surface and subsurface historical condition of Plaintiff's property but fails to put forth any reliable scientific principle or method to support the conclusions he reaches regarding drilling mud.

      Plaintiffs respond first that the reference to the "extensive" loss of drilling mud is adequately documented by Dominion's own project notes that quantify the use of more than one million gallons of water for the project that was mixed with bentonite mud in proportionate quantities.  They argue that the fact that this mud never returned to the surface, as documented in the same project notes, necessarily implies that the mud remained underground and is therefore an adequate factual

basis on which to support Dr. Parizek's evidentiary statement that there was an "extensive" loss of mud. Next, Plaintiffs contend that bentonite mud is clayish and non-porous when dry so it would, by its very nature, act as a sealant. It adds further that while Defendant can challenge Dr. Parizek's factual assertions on cross-examination, there is a factual basis for his evidentiary statements.

At the outset, Defendant's contention that Dr. Parizek's characterization of the loss of drilling mud as "extensive" is not based on reliable principles or methods because he does not cite to objective evidence as to quantity goes to weight and credibility, rather than reliability. Dr. Parizek expressly states in the introduction to his report,

> Methods reported to construct the Dominion Gas transmission line and difficulties encountered, must be understood in the context of the hydrogeologic setting. I did not witness pipeline construction and must rely upon observations made by Mr. Fisher, reports of problems encountered during its construction, actions taken, by the length and depth of the pipeline and consequent drainage problems reported by Allen and Mr. Fisher.

Dr. Parizek Report at 2. He clarifies that he is basing his opinion on the notes of Defendant's representatives in conjunction with the hydrogeologic setting of the property. This creates "good grounds" sufficient to satisfy the requirement that his opinion on the proliferation of bentonite mud loss be based on reliable principles and methods. *See Buddy's Plant Plus Corp. v. CentiMark Corp.*, 978 F.Supp.2d 523, 533 (D.Del. 2013) ("That Hodgin only visited the site once and allegedly contradicted himself in his expert report and deposition affects the weight and

credibility of Hodgin's testimony, and not to his qualifications or methods used to support his opinion."); *see also Perry v. Novartis Pharmaceuticals Corp.*, 564 F.Supp.2d 452, 467 (E.D.Pa. 2008) ("The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result"); *Wolfe v.McNeil-PPC, Inc.*, 881 F.Supp.2d 650, 657 (E.D.Pa. 2012) ("[F]ailure to detail the amount of ibuprofen used and some other aspects of her methodology does not render that methodology unreliable. Dr. Neuman's expert report provides a thorough description of the procedure she followed . . . [Defendants] may cross-examine Dr. Neuman regarding the amount of ibuprofen she used.").

Defendant's concerns regarding Dr. Parizek's failure to properly interpret the project notes, as well as his failure to do any subsurface testing, are matters to raise on cross-examination. The Court expects that this may well occur

However, whether experts in Dr. Parizek's field would typically rely upon only the project notes of Defendant's representatives under Rule 703 is impossible for the Court to determine at this juncture. *See Montgomery County v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003) ("When a trial judge analyzes whether an expert's data is of a type reasonably relied on by experts in the field, he or she

should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert. If the data underlying the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded.") (citations omitted). As such, the Court will deny Defendant's motion to exclude Dr. Parizek's characterization of the loss of drilling mud as "extensive." Nevertheless Defendant is free to renew its objection on this basis at trial, pending a more developed record on the issue.

As for Dr. Parizek's reference to the bentonite mud acting as a sealant, this comment is based upon general properties of bentonite drilling mud, knowledge of which is widely accessible. If Defendant intends to debate those qualities of bentonite at trial, that argument similarly goes to weight rather than reliability. However, because Dr. Parizek bases his allegation of underground sealing on the fact that the mud loss was "extensive," to the extent that this Court may find at a later time that this conclusion is not based upon sufficient facts or data, Defendant may then revisit this issue.

With regard to Defendant's general objection as to the reliability of Dr. Parizek's opinion because he does not put forth a reliable principle or method to support his ultimate conclusions regarding causation, the Court will defer that inquiry until I have a more developed factual record on Dr. Parizek's methodology. While it is clear that Dr. Parizek is knowledgeable about the sciences on which his

report is based, it is not entirely clear to this Court how he reached his ultimate conclusions. Moreover, while it is true that an expert witness's qualifications are relevant to the reliability inquiry, and Dr. Parizek's qualifications are impressive, that alone cannot make an expert opinion reliable; Dr. Parizek must demonstrate to the Court at trial that his opinions are based on reliable principles and methods. Defendant is free to renew its objection to Dr. Parizek's testimony on this ground at trial.

**B. Report of William J. Rogers**

In its next motion, Defendant argues that certain portions of William J. Rogers' expert opinion are no more than unreliable guesses because he has leaped into a false conclusion that Defendant's installation of the pipeline has changed the field characteristics of the Fisher farm.[3] Specifically, it first argues that Mr. Rogers is unable to substantiate his opinion that the existing soil drainage classifications on the farm have been altered; second, that he relies on the premise that the drainage beneath the property is "patterned" rather than "random," which he all but

---

[3] Specifically, the objectionable opinions are as stated:

1. "However, the fields have changed due to the pipeline installation. The soil characteristics and drainage within the field have been modified."
2. "The installation of the pipeline has changed the soil drainage classes of the soils within these fields. Prior to the pipeline being installed, these fields where [sic] primary fields for manure application due to their size, yield potential, and location on the farm. After the installation of the pipeline, they are going to be limited in their ability to receive on-going manure applications which will hinder the ability of the farm to economically expand in the future."
3. "Due to the pipeline installation there will be reduced [crop] yield."

Expert Report of Mr. William Rogers at 2-4, ECF No. 60-2.

concedes to be false; and third, his opinion that the farm will experience a reduced crop yield as a result of the pipeline activities is contradicted by Plaintiffs' own reported crop yields.

Plaintiff responds that Defendant's arguments confuse facts with opinions. Additionally, they contend, all of the opinions objected to by Defendant have a reasonable factual basis. Moreover, as for Mr. Rogers' opinion regarding crop yields, he has simply observed the fact that the fields are frequently underwater and has formed his opinion based on a logical extension of that fact.

Relying on the case law previously cited, these objections are easily disposed of. First, while it may be true that the soil classification must be officially changed in order to effectuate a change in the way the farm is regulated, the Court does not understand Mr. Rogers to claim that the classification has or will officially change. Rather, the Court understands Mr. Rogers to rely on the characteristics and properties of the soil to demonstrate that the classification has in actuality changed, if not legally or officially. Moreover, that Mr. Rogers does not detail what he believes the new soil classifications should be does not render his opinion unreliable. *See Wolfe*, 881 F.Supp.2d at 657 ("[F]ailure to detail the amount of ibuprofen used and some other aspects of her methodology does not render that methodology unreliable. Dr. Neuman's expert report provides a thorough description of the procedure she followed . . . [Defendants] may cross-

examine Dr. Neuman regarding the amount of ibuprofen she used."). This holding applies equally to Defendant's argument regarding the classification of the drainage system. *See Buddy's Plant Plus Corp.*, 978 F.Supp.2d at 533 ("That Hodgin only visited the site once and allegedly contradicted himself in his expert report and deposition affects the weight and credibility of Hodgin's testimony, and not to his qualifications or methods used to support his opinion."). Defendant can, of course, use the lack of official classification change to contradict Mr. Rogers' opinions on cross-examination; however, the Court cannot say that his testimony is unreliable merely because there has been no official decision to back up his opinion.

Finally, Mr. Rogers has set forth a detailed analysis of the characteristics of the crops grown on the Fisher farm in conjunction with the current conditions of the land. Consistent with this knowledge, he details his opinion that the farm will experience crop yield losses because the crops cannot withstand the current conditions. This is sufficient to state an opinion under Rule 702. Consequently, the motion to exclude must be denied. However, after a more complete factual record regarding Mr. Rogers' methodology is developed at trial, Defendant is free to renew its objections to Mr. Rogers' testimony on this ground.

**C. Report of Allen S. Fisher**

In its final motion, Defendant seeks to exclude several statements made by Plaintiff Allen S. Fisher in his rebuttal report on the basis that he lacks the necessary qualifications to be an expert witness. It argues that Mr. Fisher is a dairy farmer, landowner, and plaintiff in this case, but that he is not a geologist, hydrogeologist, soil specialist, accountant, nutrient management or environmental expert and therefore does not have the requisite qualifications. Defendant extracts seventeen sentences or paragraphs from Mr. Fisher's report and separately argues why he is not qualified to provide each opinion. Plaintiff responds that the challenged statements amount to nothing more than Mr. Fisher's own personal observations of the farm he owns and has worked on for the past sixty years, and that his opinion constitutes a permissible lay opinion under Federal Rule of Evidence 701.

Rule 701 states, "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Under Rule 701, a lay witness may offer his opinion if it is based upon facts or observations that the witness has perceived. *See Teen-Ed, Inc. v. Kimball*, 620 F.2d 399, 403 (3d Cir. 1980) ("The modern trend favors the admission of opinion

testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination.").[4]  "The expression of opinions or inferences by a lay witness is permitted because of the qualifications in Rule 701(a) that that the factual predicate of the testimony be within the witness's perception." *Id.*[5]; *see also Government of Virgin Islands v. Knight*, 989 F.2d 619, 629-30 (3d Cir. 1993).

Moreover, the second prong of the Rule 701 inquiry requires that the proposed testimony be more than merely related to the issues in the case. *See Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Engineering*, 57 F.3d 1190, 1201 (3d Cir. 1995). Rather, the opinion testimony must be "reasonably reliable." *Id.* To that effect, "Rule 701 requires that a lay opinion witness have a reasonable basis grounded either in *experience or specialized knowledge* for arriving at the opinion that he or she expresses." *Id.* (citing *U.S. v. Paiva*, 892 F.2d 148, 157 (1st Cir. 1989)). However, this does not mean that the proposed lay witness have particular educational training; the witness need only demonstrate "some connection between the special knowledge or experience of the witness, however acquired, and the witness's opinion regarding the disputed factual issues in the case." *Id.* at 1202.

---

[4] Contrary to Defendant's argument in its reply brief, while the court in *Teen-Ed* did note that they were making an "exception to [their] usual" rule, the rule to which they were referring was not Rule 701 but rather the rule that an appellate court should only consider arguments that have been previously presented to the district court.
[5] The court further ties Rule 701 into Federal Rule of Evidence 602 which requires that a witness have personal knowledge of a matter on which they testify and noted that the difference between Rules 701 and 702 is that an expert has wider latitude to testify on knowledge outside his personal perception. That is, he can testify as to facts made known to him by others, not only from facts and data perceived by him. *See id.* at 403-4; *see also* Fed. R. Evid. 602.

Defendant objects to many of the statements in Mr. Fisher's rebuttal report. All of the statements objected to constitute lay testimony as to what Mr. Fisher perceived occurring on his property, or the opinions and inferences he formed therefrom. Moreover, contrary to Defendant's assertions, the fact that Mr. Fisher owned and worked on his farm for many years, in addition to seeing the farm through the installation of the pipeline is sufficient to make most of his opinions reasonably reliable.

However, this Court is unable to perceive how two of Mr. Fisher's statements regarding the properties of bentonite mud[6] can be within Mr. Fisher's experience or specialized knowledge based on his qualifications as they have been presented to the Court. While Mr. Fisher has had years of experience working with his land and his farm, this alone is insufficient to qualify him under Rule 701 to explain the properties of bentonite mud. Consequently, Mr. Fisher must demonstrate at trial that he is qualified to testify as to the properties of bentonite mud either through experience or specialized knowledge, such that he can reliably form the aforementioned inferences as to what it did to his land.

---

[6] Specifically, those statements are:

1. "[D]ominion lost millions of gallons of bentonite mud – which is known for being nonporous and sealing ponds."
2. "[B]ecause of this bentonite mud escaping sideways underground, much my fields are now non-porous, not just the tiny area along the right of way."

Report of Mr. Allen Fisher at 3-4, ECF No. 62-2.

However, the remaining statements at issue constitute permissible lay testimony under Rule 701. Whether these observations, opinions and inferences are incorrect is an issue for Defendant to pursue on cross-examination. It is not, however, grounds to keep Mr. Fisher's testimony from being heard at all. Consequently, Defendant's motion to exclude Mr. Fisher's testimony based on its objections to the two aforementioned statements regarding the properties of bentonite mud is denied without prejudice, pending an explanation by Mr. Fisher at trial as to why he is qualified to make those statements. However, its motion to exclude the remainder of the specific and discrete statements and opinions within Mr. Fisher's report is denied with prejudice.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motions *in limine* as to Dr. Richard R. Parizek and Mr. William J. Rogers will be denied without prejudice with leave to renew its objections at trial in accordance with this memorandum opinion. Defendant's motion *in limine* as to Plaintiff Allen S. Fisher will be denied without prejudice as to the two statements regarding bentonite mud but with prejudice as to the remaining specific and discrete statements objected to therein.

BY THE COURT

<u>s/ Matthew W. Brann</u>
Matthew W. Brann
United States District Judge
